Good morning, Your Honors. Samuel Cross for Mr. Beltran, and I'd like to reserve three minutes of time for rebuttal. I also appreciate the Court's willingness to let me present remotely here as I recover from COVID. I hope, we all hope, we all hope you're doing better. I'm doing much better, but under the circumstances, why is it appropriate? So again, thanks to the Court. Thank you for letting the Court know, and again, we hope you have a complete and swift recovery. You can hear us okay? I can hear the judges. I can't see if opposing counsel is prepared. I'm prepared to present. Yes, we're all set, so whenever you're ready. Thank you, Your Honor. As I noted, Samuel Cross, Federal Public Defender for Mr. Beltran, and here there are a number of issues raised in our brief. My intention is to focus largely on the question of arrest and probable cause. Of course, the Court will ask me questions about whatever the Court has questions about. There are one or two unusual issues that I'd like to flag right at the start about the arrest and the probable cause. Here, the Court's ruling below was oral and quite spare, and the Court held the stop justified on the basis of reasonable suspicion. But as noted in a number of cases, including Washington v. Lambert, was primarily an otherwise constitutional stop with reasonable suspicion can become unconstitutional if it's conducted in a manner that causes it to be an arrest, and that's our primary argument here, I would certainly represent. In addition to that, as to the arrest argument, the government didn't argue in its papers that probable cause existed here, simply that it wasn't an arrest, so in our view, that argument is waived. The issue here as to whether there was an arrest, of course, depends on two factors under this Court's jurisprudence. It both looks at the perspective of the arrestee and whether a reasonably innocent person would feel free to leave after brief questioning or alternatively would feel that continued detention was virtually inevitable. And it also looks at the perspective of arresting officers, and specifically at the question of whether a reasonable amount of force was used for the circumstances of a detention, looking at all the factors, all the facts, excuse me, it's a fact-intensive inquiry. And again, Washington v. Lambert gives us a lot of factors to look at, and zeroing in on these, most of the Lambert factors are not met. So here, there is no indication in the call or what officers observed at the weapon. Yeah, but there was significant indication from observers who had no stake in the outcome that there was an exceedingly violent assault going on, right? They were so concerned. At least one of them talked to the police officers before they went into the store. There were a number of calls, and they were describing a very violent assault, right? So I wouldn't disagree with the Court about that. The caller did call or was called back by dispatch, so there were repeated calls, and he did describe an ongoing assault, no question about that. And there was a witness on the scene, too, right, who came up and talked to the officer, right? There was another person on the scene who appears to have been different from the callers. Right, and said they're in the frozen food or soda aisle or whatever. He said that the other person said they were in the soda aisle. It's not clear what his basis of knowledge for that was. They're ultimately found against the back wall of the store, apparently the frozen goods aisle. But as to violence, we certainly would agree that if there's a question here under the Lambert factors, it's the question of whether what the officers are investigating closely follows a violent crime. And no question, domestic assault is violent, but we have to look specifically at the nature of the violence that the officers are investigating. And if they use force that would otherwise amount to an arrest, the question is, is the force reasonable under the circumstances? So we have to look specifically at the violence, and that's where I would draw a sharp distinction between the cases upon which the government most primarily relies, and here it's Miles and Edwards. Both of these involve officers, both of those cases, excuse me, involve officers who are investigating a firearm crime, and not just firearm crimes. In both cases, reports of individuals discharging firearms at the public. Counsel, you're not arguing that domestic violence calls are not dangerous, are you, or not crimes of violence? No, Your Honor, I'm not arguing that. What I am arguing is that the level of force appropriate to investigating a domestic violence incident, such as this one, is different from the level of force appropriate where an individual has been discharging firearms at, as in one of the cases I referred to, passing vehicles or into or towards houses. But the 911 reports indicated that the victim was being both choked and beaten to the point that blood was appearing. I mean, how much more violent does it have to get than that? Even though no weapon had been seen at that point. Two points in that respect. One, Your Honor, the officers making the decision to use force here, the courts focused on their perspective, and their detail about this was less rich. So what they had been told is that they were looking for a bald, white male, approximately 24 years old, dark shirt and shorts, assaulting a, quote, female Hispanic wearing a dress. So they had some idea that there was an ongoing assault, but the more vivid details to which the court refers, to my knowledge, are not before the officers. The other question is how much force is needed, even in the case of a very violent and troubling physical assault, how much force is needed when the officers show up based on what they're presented with. And when the officers show up, what they're presented with is in distinction to what's been described. There is not an ongoing assault. They see two parties, no weapons in hand, no suggestion of weapons, shopping. And the question is, is it reasonable under those circumstances for the officers to do what they did, which was very rapidly and using a significant amount of physical force and surprise to come up to the individuals and cuff the male party. Well, you're overlooking that testimony. I mean, we've got a 25-year veteran of the Los Angeles Police Department and his partner, who obviously was not quite as experienced, who testified that, in his experience, domestic violence calls can frequently, quickly get out of hand and harm either the victim or the officers. And so they formulate a plan before they approach that they are going to, if you will, take steps to ensure that this call does not become an aggravated assault by, if necessary, putting hands on the male suspect and placing handcuffs on him, assuring him that he's not under arrest at that point but that they're doing this for everyone's safety. What's wrong with that? I focus on the court's use of the if necessary. There was no question that the defendant, the suspect here, was immediately going to be physically seized and restrained. Their behavior in that respect, the officer's behavior, didn't depend on what they observed on the scene. They just walked up and did it despite what they observed on the scene. I'm a very experienced police officer who's probably responded to hundreds of these types of calls in 25 years. I'll note that the officer's testimony and declaration didn't include the statement that he does this in every case or it's warranted in every case. No, but he did say, for example, in his declaration in paragraph 3, from my training and experience, I know that domestic abuse incidents are some of the most dangerous and volatile incidents to which officers respond. They are dangerous to officers, victims, and the public. They may involve weapons. And sadly, we read about this stuff in the paper all the time, about domestics going bad. Certainly, Your Honor, the danger of a domestic, report of a domestic, doesn't warrant the application of this force simply because there is a suspected domestic that requires further investigation. I would request to reserve the remainder of my time unless the Court has further questions. No, and we'll give you two minutes for your rebuttal. Thank you, Your Honor. Good morning, and may it please the Court. Elia Herrera on behalf of the United States. LAPD officers responded to a 911 call about an ongoing and serious assault happening in public, involving a bald white man wearing a backpack hurting a Hispanic woman in a dress, so much so that she was possibly injured. And as Your Honors pointed out, he's taken witness to confirm the urgency of the situation when he saw the officers canvassing around, walked up to them, and said, they're in the food for less, in the soda aisle. Under these circumstances, the officers acted reasonably at every stage of the encounter, including the Terry stop and frisk that led to the discovery of the gun. And I'd like to focus on the issue of whether the stop became an arrest based on the safety measures that the officers took. I disagree with defense counsel as to the nature of the call in this case. The officers received information about a battery. They received information about a woman being assaulted that was possibly injured. And I find that the district court found that Officer Tulligan was credible. And as Your Honors pointed out, Officer Tulligan testified and included in his declaration information about how dangerous and volatile these incidents can be. Defense counsel faults the officers for coming up with a plan before they got to the scene. But regardless of whether there was an ongoing assault when they got there, they had information both about this specific incident and the violence that was happening, and also the experience of Officer Tulligan and how dangerous these can be. And another thing that I would like to highlight about this incident is that it was happening in public. This was, as I said earlier, a complete stranger is coming up to the officers and saying, they're in the food for less, in the soda aisle, go find them. This is something that is causing such a commotion that strangers are coming up to the police officers. And Your Honor, in reviewing the video, you see the officers walking into the store, and you see children, you see people shopping around. I think the officers were more than justified in their plan to immediately seize control of the situation in case, as Your Honor pointed out, it turned violent, it turned bad. And I'd also like to focus on the actions that the officers took there. They went up to the defendant, they held on to him and they handcuffed him. They told him repeatedly, we'll let you go, we're just investigating, we're detaining you. And under those circumstances, a reasonable, innocent person would feel that they would be free to leave after brief questioning. Therefore, Your Honor, the safety measures that the officers took here, which was handcuffing the defendant for less than a minute before they found a gun, telling him they were only detaining him, did not transform this into an arrest. Unless the court has questions about that issue, I'd like to move on to the reasonable suspicion to stop the defendant. And as a district court found in this case, it was, this is an easy question. The officers had both physical descriptions of the victim and the suspect in this case, a white, bald man with shorts and a backpack, a Hispanic woman in a dress, and information regarding their location. Another one caller had talked about, they're in the Food for Less parking lot, they're walking to the Food for Less, and then you have, as I said, a second witness who goes up and says, they're in the Food for Less in the soda aisle. So they walk into the store, and they have these descriptions and this location in mind, and they see a man and a woman together, different complexions. The man is bald, dark shorts, shirt, wearing a backpack, and a woman in a dress-like outfit. With that, the officers had reasonable suspicion to stop and investigate. And as to, just briefly touching on the probation and parole question, whether that was appropriate, my first point is that the question did not actually prolong the investigation, because as your honors saw in the video, the question was asked as they were handcuffing the defendant. So it wasn't like they actually prolonged the investigation, if anything, for more than a second. And I don't think it was even a second. And the second thing I'd like to point out about this is that these officers are not engaged in a phishing expedition. They're responding to a call about a violent act. And under Rodriguez, as well as other traffic stop cases, which is not what this was, this was a violent act investigation, officers are allowed to ask limited questions about someone's criminal history for their own safety. And in this case, I think that question about whether he was on probation or parole went to both the investigation, whether he has a conviction for similar acts, and also the safety of the officers. Officer Tilligan, I believe, testified that he does ask this question to see whether there's any history of violence, like, for example, assaulting police officers. And then my last point is, again, one that the district court found to be quite easy, whether there was reasonable suspicion to frisk him. And here, the district court found that officers frisked the defendant after he admitted that he had a gun, and so there was certainly reasonable suspicion to frisk him after that admission. And unless the court has any questions, I'd like to submit an argument in our papers. Thank you very much. Thank you. As I say, counsel, you have two minutes for rebuttal. Thank you, Your Honors. I appreciate it. I'd like to focus on the second half of the arrest inquiry, which looks at what a reasonably innocent person in the position of the suspect would think about whether they would surely be permitted to leave. And the government's position is that we should parse the officer's statement and rely only on the parts where he says, I'm going to let you go if you didn't do anything. But the court has to look at the totality of these circumstances. And here, if the court watches the video, it's extremely rapid. One officer approaches from Mr. Veltrin's left, and this is the training officer, and he says something about a domestic, but it's very difficult, would be very difficult for an innocent person shopping to interpret that, to understand what was going on before he's immediately seized from behind by this other officer. And it's a bit unclear from the video exactly what Mr. Veltrin's response is, but when he's not immediately goes limp and becomes compliant, Officer Tulogham gives him this very long explanation, which consists in great part of threats, things that will happen to the suspect if he doesn't comply. And the question for the court is, a reasonably innocent person shopping in this position, not, as in the cases cited by the government, traveling near the border, subject to border inspection, but going about their business who is suddenly physically restrained and attempted to be placed in handcuffs by officers, what impression is that going to leave on a reasonable person? And here, it's our position that at that point, especially if you have no knowledge of a domestic, you're going to believe that you're going to be placed in custody for a long time, and so for that reason also, it's an arrest. I don't disagree with you that when the officer said that, he may have not really meant it, because they had other evidence to support the felony assault or the domestic violence, and even if she had said nothing happened, nothing happened, which she kind of did, they wouldn't drop it at that point. But was this a Terry stop? Was it a legitimate Terry stop? Don't you agree that there was much, much more here than there ever was in Terry v. Ohio? No, Your Honor, our position is that it wasn't. It certainly wasn't a seizure. But tell me, what did the police officer know about the suspects who he grabbed and frisked in Terry? Did they look at the case? I mean, this is like a textbook case. So in Terry, Your Honor, I believe it's the suspect. He's pacing back and forth out in front of the store, thinking about casing it. Why would you say he was casing it? Because the officer said, in my 30-plus years of walking this beat, I've seen this kind of thing before, and there was nothing there. There were no weapons. There was no person saying, hey, somebody's looking suspicious outside this store. It's in the afternoon when people might be walking up and down and talking to each other. And if the U.S. Supreme Court said what happened in Terry was sufficient, they're giving great leeway to police officers to use their experience to determine when they need for their own personal safety to make a stop and frisk. So, Your Honor, I would distinguish Terry from this largely on the basis of the officer's observations. In Terry, we're discussing an officer's observations of a suspect that give rise to reasonable suspicion. Here, conceitedly, on the government's behalf, the officer's observations on the scene didn't give rise to reasonable suspicion. Our argument that there wasn't reasonable suspicion is based on the poorness of fit, or not poorness of fit, but inadequacy of fit, between the description the officers had and the couple they saw. And I'm over time, so unless the court has any more questions. You should have a little more time. I took most of your minutes. Thank you, Judge Lesnik. I was simply going to reiterate that we would concede that the stronger argument here is the argument about arrest, and it's our position that both because a person in Mr. Dalton's position would not have felt free to leave after brief questioning based on the totality of the circumstances, the way he was seized, and because of the level of force the officers used, which was, I certainly don't mean to imply that officers don't have a difficult job, but here, based on all the circumstances, the court has to exercise its independent authority to review and determine whether the level of force was reasonable, and it's our argument that it's not. So, on that, I would submit thank you. All right. We thank counsel for their arguments, and the case just argued will be submitted. With that, we cancel already. We'll proceed to the next case on the argument calendar.
judges: TALLMAN, BENNETT, Lasnik